1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10

11  ANNETTE DAVIS,                    )    NO. EDCV 10-01591-SS
                                       )
12              Plaintiff,             )
                                       )
13          v.                         )    **MEMORANDUM DECISION AND ORDER**
                                       )
14  MICHAEL J. ASTRUE,                 )
    Commissioner of the Social         )
15  Security Administration,           )
                                       )
16              Defendant.             )
    _____   )
17

18

19                                     **I.**

20                                **INTRODUCTION**

21      Annette Davis ("Plaintiff") brings this action seeking to overturn

22  the decision of the Commissioner of the Social Security Administration

23  (the "Commissioner") denying her application for disability insurance

24  benefits and Supplemental Security Income ("SSI") benefits.  On March

25  25, 2011, Plaintiff filed a complaint (the "Complaint") commencing the

26  instant action.  On June 1, 2011, Defendant filed an Answer to the

27  Complaint (the "Answer").  On June 16, 2011, Plaintiff filed a Reply

28  Memorandum in Support of the Complaint (the "Reply").  The parties have

consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons stated below, the decision of the Commissioner is AFFIRMED.

## II.

### PROCEDURAL HISTORY

On February 27, 2003, Plaintiff filed applications for disability insurance benefits and SSI benefits under Titles II and XVI. (Administrative Record ("AR") 287-95). Plaintiff was born on July 26, 1964 and was 38 years old at the time she filed her applications for disability insurance benefits and SSI. (AR 287). Plaintiff's initial applications allege disability beginning on March 26, 2000, due to carpal tunnel syndrome in both hands. (Id.). Plaintiff's disability insurance benefits and SSI application were denied initially and upon reconsideration. (AR 296-304). Plaintiff then requested a hearing by an Administrative Law Judge ("ALJ") that took place on August 17, 2004. (AR 307-19). The ALJ determined that Plaintiff was not disabled on September 20, 2004. (AR 9-19). Plaintiff requested review of the ALJ's decision, which was denied by the Appeals Council. (AR 4-6). Plaintiff then filed civil action EDCV 05-00821, and the District Court remanded pursuant to sentence four of U.S.C. §405(g)(2011), following the parties' stipulation to remand. (AR 440-54).

On August 22, 2005, Plaintiff filed another application for disability insurance and supplemental security benefits. (AR 345). An administrative hearing was held on November 28, 2006. (AR 359-91). On January 26, 2007, the ALJ issued a decision finding Plaintiff not

2

disabled. (AR 345-53). On April 14, 2007, the Appeals Council vacated the ALJ's final decision and remanded the matter consistent with the Court's remand order. (AR 436-39). Another administrative hearing was held on August 30, 2007, after which the ALJ issued a decision again finding that Plaintiff was not disabled. (AR 889-906). Plaintiff then filed another civil action in the District Court, EDCV 08-00538. (AR 907-09). On October 20, 2008, the District Court issued a judgment of remand. (AR 938-39).

A further administrative hearing then took place in San Bernardino, California on January 28, 2010 with ALJ David M. Ganly presiding. (AR 1123-49). Plaintiff, represented by counsel, appeared and testified. (AR 1131-35). A supplemental administrative hearing took place on June 29, 2010, during which Luis O. Mas, an impartial vocational expert, testified. (AR 1150-71). On August 6, 2010, the ALJ issued an unfavorable decision, finding Plaintiff capable of performing other jobs that exist in significant numbers in the national economy. (AR 861-71). Plaintiff then requested judicial review by filing this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)(2011).

\\
\\
\\
\\
\\
\\
\\
\\
\\

### III.

### FACTUAL BACKGROUND

**A.   Plaintiff's Medical History**

Plaintiff's medical history includes notes from the San Bernardino County Department of Behavioral Health.  (AR 203-34, 984-1021, 1088-1107).   It also includes various assessments of Plaintiff's physical and mental abilities to do work.  (AR 856-57, 1023-25, 1031-32).  Regarding Plaintiff's physical ability, on October 29, 2008, a physician completed a "medical opinion" form concerning Plaintiff's ability to do physical work-related activities.  (AR 1023-25).  The physician noted that Plaintiff had the ability to stand for sixty minutes before changing position, the ability to stand and walk for about four hours with normal breaks during an eight hour day, no limit to her ability to sit with normal breaks during an eight hour day and she would not need to lay down at unpredictable intervals during a work shift.  (AR 1023-24).  The physician also stated that Plaintiff could occasionally twist, stoop and climb stairs and could never crouch or climb ladders and that these findings were supported by carpal tunnel symptoms. (AR 1024).  The physician concluded that the Plaintiff would be absent from work due to impairments or treatment less than once a month.  (AR 1025).

Regarding Plaintiff's mental ability, on June 24, 2010, Gurmit Sekhon, M.D., of the San Bernardino County Department of Behavioral Health wrote a letter clarifying his diagnosis of Plaintiff as bipolar and stating that Plaintiff suffered from irritability, paranoia,

4

helplessness and anhedonia, as well as having a history of auditory and visual hallucinations, paranoid ideation, difficulty relating and trusting people, irritability and inability to take care of her needs. (AR 1085). Dr. Sekhon prescribed Plaintiff Ambien, Seroquel, Limbitrol and Zoloft and noted that "without medication, [Plaintiff] would decompensate evidenced by increased depression, anxiety, nervousness, moody spells, [inability] to do chores or stay focused[,][ ]isolation, difficult[y] relating to people and neglect [of] herself, both in her care and her hygiene." (Id.).

Notes from Dr. Sekhon's treatment of Plaintiff, dated March 2, 2003 to June 25, 2010, are also included in the record. (AR 203-220, 984-1021, 1087-1101). The treatment notes document Plaintiff's reported symptoms of mental illness. However, Dr. Sekhon's more recent treatment notes depict an improvement in Plaintiff's mental state provided she maintains ongoing medication ("[symptoms] are well controlled with the medication"). (AR 1087-98). Dr. Sekhon noted on January 4, 2010 that Plaintiff had "[n]o evidence of any agitation or acting out" and "[m]edications are helping her." (AR 1098). On February 5, 2010, Dr. Sekhon again noted "[m]edications help [Plaintiff]." (AR 1096). He also stated that Plaintiff "[r]eported less period[s] of depression, anxiety, irritability, and isolation. Less paranoia . . . No evidence of an agitation or episode of violent or inappropriate behavior." (Id.). He further noted Plaintiff's "[s]leep, appetite, and level of energy are getting better with the medication." (Id.).

Dr. Sekhon noted again during a March 12, 2010 examination that Plaintiff's medications "help her" and she had "less auditory

hallucinations of negative nature" and "less feelings of helplessness, hopelessness, anhedonia, isolation, and irritability." (AR 1093). On April 16, 2010, Dr. Sekhon noted that Plaintiff had "[n]o agitation. No intrusive behavior . . . Able to relate.  Stayed focused." (AR 1090).  Dr. Sekhon noted on May 21, 2010, Plaintiff was "alert, cooperative, directable, less anxious, and less distanced" and "[s]leep, appetite, and level of energy are better with medication." (AR 1087).

**B.   Consultative Exams**

Several separate physicians conducted consultative exams of Plaintiff in between 2003 and 2010. (AR 235-40, 242-47, 248-51, 252-65, 266-70, 271, 272, 273, 823-25, 828-36, 1046-50).   On April 28, 2003, Dr. Laurence Meltzer conducted an orthopedic evaluation of Plaintiff. (AR 235-40).  Dr. Meltzer opined that Plaintiff had "no evidence of carpal tunnel syndrome." (AR 239).  He also noted that although Plaintiff "complain[ed] of severe pain with the slightest touch of her wrists, she [did] have full range of motion." (Id.).  Dr. Meltzer concluded that Plaintiff did "not have any functional disability from a purely orthopedic standpoint." (Id.).

On May 1, 2003, Dr. Linda Smith conducted a psychiatric evaluation of Plaintiff. (AR 242-47).  Dr. Smith did not see "any evidence of any depression that would warrant a psychiatric diagnosis.  In addition, she was not at all credible in the formal mental status examination." (AR 247).   Dr. Smith noted that for thought processes, Plaintiff was coherent and organized. (AR 244).  Plaintiff's thought content was relevant and non-delusional and "[t]here was no bizarre or psychotic

thought content.   There was no current suicidal, homicidal or paranoid ideation." (AR 245).   As a result, Dr. Smith believed that Plaintiff "appeared to be attempting to feign a poor mental status and the problems she portrayed were strikingly inconsistent with the rest of the interview." (AR 247).   Dr. Smith concluded that "[f]or these reasons, [she did] not believe that [Plaintiff had] a psychiatric disorder" and Plaintiff did "not appear to be impaired due to a psychiatric disorder." (Id.).

On May 15, 2003, Dr. Larry Havert, a clinical psychologist, completed a Short-Form Evaluation for Mental Disorders concerning Plaintiff. (AR 248-51).   Dr. Havert noted that while Plaintiff had "difficulty controlling anger impulses" she also possessed "normal" motor activity and had "cooperative" interview behavior. (AR 248).   He concluded that Plaintiff was "marginally stable with periods of depression [and] anger" and was capable of managing funds in her best interest. (AR 250-51).

On May 27, 2003, Dr. Myra Becraft, a psychiatrist, completed a psychiatric review of Plaintiff. (AR 252-65).   Dr. Becraft determined that Plaintiff's "allegations [were] not totally credible." (AR 252). Dr. Becraft also determined that Plaintiff had no restrictions of activities of daily living, difficulties in maintaining social functioning, episodes of decompensation, each of extended duration and only mild difficulties in maintaining concentration, persistence or pace. (AR 262).   Dr. Becraft also completed a Mental Residual Functional Capacity Assessment of Plaintiff. (AR 266-70).   Dr. Becraft determined that Plaintiff had no limitations in sustaining an ordinary

routine without special supervision, working in coordination with or proximity to others without being distracted by them, maintaining socially appropriate behavior and responding appropriately to changes in the work setting. (AR 266-67). Dr. Becraft ultimately determined that Plaintiff was not credible. (AR 270).

On July 23, 2003, Dr. Donald Williams, a psychiatrist, examined Plaintiff and concluded Plaintiff had "no evidence of depression . . . at all" and Plaintiff "was not credible at all." (AR 271). Dr. Williams also noted Plaintiff "exaggerated and tried to manipulate the outcome of the [mental status] exam." (Id.). On May 12, 2003, Dr. Norman Cooley also examined Plaintiff concerning carpal tunnel syndrome. (AR 272). Dr. Cooley determined that Plaintiff had "no evidence of carpal tunnel syndrome or any other impairment." (Id.). On July 24, 2003, Dr. Gwendolyn Taylor-Holmes examined Plaintiff and determined there was "no evidence of [a] severe medically determinable impairment which limits work capacity for a continuous twelve month period." (AR 273). Dr. Taylor-Holmes also completed a Physical Residual Functional Capacity Assessment of Plaintiff. (AR 828-36). In it, she determined that Plaintiff "is partially credible as it relates to symptoms but not to the extent that she is totally disabled" and "the medical evidence does not support a finding of disability." (AR 834).

On November 7, 2005, Dr. K. Gregg completed another Mental Residual Functional Capacity Assessment of Plaintiff. (AR 823-25). Dr. Gregg determined that Plaintiff was not significantly limited in her ability to sustain an ordinary routine without special supervision, to maintain socially appropriate behavior and the ability to get along with

8

coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 823-4). Dr. Gregg noted that while Plaintiff could not "work with the public," she could "adapt and relate to coworkers and supervisors." (AR 825).

On March 7, 2010, Dr. Kim Goldman, clinical psychologist, completed a psychological evaluation of Plaintiff. (AR 1046-50). Dr. Goldman could not record valid test results because Plaintiff did not "make an adequate effort on the tasks presented to her." (AR 1048). She also noted that Plaintiff's "performance reflects that she is attempting to simulate cognitive impairment" and Plaintiff "endorsed items that represent an over reporting of psychopathology in an attempt to appear more disturbed than she is in reality." (AR 1049). Dr. Goldman concluded that Plaintiff's "functional limitations were unable to be accurately assessed due to malingering." (AR 1050).

C.   **State Agency Doctors**

Plaintiff was evaluated by Dr. Samuel Landau, an impartial medical expert in internal medicine, who determined that she cannot do forceful gripping, grasping or twisting with her hands, but she can do occasional fine manipulation and frequent gross manipulation. (AR 1137). She can also stand, walk and sit for 6 hours out of an 8 hour workday with normal breaks. (Id.). Dr. Landau did not find any indication in the record that Plaintiff was a malingerer. (Id.). During the hearing, Dr. Landau stated that Plaintiff did not have any conditions that would meet the approved list of impairments. (AR 1136). He also noted that her

medications were entirely for psychiatric use and not orthopedic.  (AR 1138).

Plaintiff was also evaluated by Dr. Joseph Malancharuvil, an impartial medical expert in psychology. (AR 1140-43, 1145-48, 1162-64). Dr. Malancharuvil testified that the psychological consultative examiner only gave the Plaintiff a diagnosis of malingering.  (AR 866).  He also testified that Plaintiff has a personality disorder with anti-social features, a mood disorder and continuing marijuana use, which do not meet the requirements for mental disability. (Id.).  He also testified that Plaintiff has no to mild impairments in activities of daily living. (Id.).  He also noted that Plaintiff's use of drugs and alcohol needed to be resolved as Plaintiff denied using them but tested positive for marijuana as well as opiate use.  (AR 1143-44, 1162).  Dr. Malancharuvil commented that while Plaintiff did "fairly well" during informal testing, she tested as "mentally retarded" during formal testing and "did not come across presenting herself adequately."  (AR 1162-63).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[1] and that is expected to result in death or to last for a continuous period of at least twelve

---

[1]    Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work he previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

11

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. §§ 404.1520(b)-404.1520(f)(1) & 416.920(b)-416.920(f)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54 (citing Tackett). Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"),[2] age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

---

[2]    Residual functional capacity is "what [one] can still do despite [his] limitations" and represents an "assessment based upon all of the relevant evidence." 20 C.F.R. §§ 404.1545(a), 416.945(a).

12

**V.**

**THE ALJ'S DECISION**

The ALJ employed the five-step sequential evaluation process discussed above.  At the first step, the ALJ indicated that Plaintiff had not engaged in substantial gainful activity since the date of alleged disability onset, September 21, 2004.  (AR 864).  Second, the ALJ found that Plaintiff suffered from the following severe impairments: bilateral carpal tunnel syndrome; degenerative disc disease of the cervical spine and lumbar spine; obesity; affective disorder; personality disorder, not otherwise specified; cocaine dependence in reported remission; and malingering.  (<u>Id.</u>).

At the third step, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meet or medically equal any of the impairments appearing in the "Listing of Impairments" set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (<u>Id.</u>).  The ALJ noted that Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listing 12.04, 12.08 and 12.09.  (<u>Id.</u>).  The ALJ considered whether the "paragraph B" or "paragraph C" criteria were satisfied and found that neither paragraph was satisfied.  (AR 864-65).  The ALJ explained that in order to determine whether the Paragraph B criteria were satisfied, "the mental impairment must result in two of the following: marked restriction of activities of daily living, marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each with extended duration." (AR 864).  The ALJ found

13

that Plaintiff's mental impairment did not satisfy at least two of the above "marked" limitations or one "marked' limitation with "repeated" episodes of decompensation extending in duration.  (AR 864-65).

Before proceeding to the fourth step, the ALJ considered Plaintiff's RFC.  In doing so, the ALJ considered all symptoms and the extent to which the symptoms can be reasonably accepted as consistent with the objective medical evidence and other record evidence.  (AR 865).  The ALJ found Plaintiff's testimony concerning the intensity, persistence and limiting effects of the symptoms was not credible, especially in light of the treatment progress notes and consultative exams.  (AR 866).  Considering the above in light of the consultative examinations and State Agency reviews, the ALJ concluded that the Plaintiff has the RFC to perform a limited range of light work as defined in 20 C.F.R. §404.1567(b) and §416.967(b), with the following limitations: she can lift and carry 20 pounds occasionally and 10 pounds frequently; she can sit, stand and walk for 6 hours out of an 8 hour work day with normal breaks such as every 2 hours; she can climb stairs, but she cannot climb ladder, work at heights or balance; she cannot do forceful gripping, grasping or twisting with her hands, but she can do occasional fine manipulation such as keyboarding; she can do frequent gross manipulations such as opening drawers and carrying files; and her mental impairments limit her to moderately complex tasks that are object oriented.  (AR 865).  In addition, the ALJ found that Plaintiff would have the additional limitation of not being responsible for the safety of others when she was using marijuana.  (Id.).

1   After the ALJ addressed Plaintiff's functional limitations, he
2   concluded that Plaintiff was unable to perform any of her past relevant
3   work as a nursing assistant. (AR 870). Work as a nursing assistant is
4   generally performed as semi-skilled work at the medium exertional level,
5   which the Plaintiff's RFC does not allow. (Id.). However, the ALJ
6   determined that considering Plaintiff's age, education, work experience
7   and RFC, there are jobs that exist in significant numbers in the
8   national economy that Plaintiff can perform. (Id.). These jobs would
9   include such representative occupations as cleaner, small parts
10  assembler and counter clerk. (AR 871). As a result, the ALJ determined
11  that Plaintiff has not been under a disability, as defined in the Social
12  Security Act, since the application was filed on April 29, 2008. (Id.).

13

14                               **VI.**

15                        **STANDARD OF REVIEW**

16

17  Under 42 U.S.C. § 405(g), a district court may review the
18  Commissioner's decision to deny benefits. The court may set aside the
19  Commissioner's decision when the ALJ's findings are based on legal error
20  or are not supported by substantial evidence in the record as a whole.
21  Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing
22  Tackett, 180 F.3d at 1097); Smolen v. Chater, 80 F.3d 1273, 1279 (9th
23  Cir. 1996) (citing Fair v. Bowen, 885 F.2d 597, 601 (9th Cir. 1989)).

24

25  "Substantial evidence is more than a scintilla, but less than a
26  preponderance." Reddick, 157 F.3d at 720 (citing Jamerson v. Chater,
27  112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which
28  a reasonable person might accept as adequate to support a conclusion."

                                 15

1    <u>Id.</u> (citing <u>Jamerson</u>, 112 F.3d at 1066; <u>Smolen</u>, 80 F.3d at 1279).  To

2    determine whether substantial evidence supports a finding, the court

3    must "'consider the record as a whole, weighing both evidence that

4    supports and evidence that detracts from the [Commissioner's]

5    conclusion.'"  <u>Aukland</u>, 257 F.3d at 1035 (citing <u>Penny v. Sullivan</u>, 2

6    F.3d 953, 956 (9th Cir. 1993)).  If the evidence can reasonably support

7    either affirming or reversing that conclusion, the court may not

8    substitute its judgment for that of the Commissioner.  <u>Reddick</u>, 157 F.3d

9    at 720-21 (citing <u>Flaten v. Sec'y</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

10

11                                  **VII.**

12                              **DISCUSSION**

13

14   **A.    The ALJ Correctly Determined Plaintiff's RFC And Properly Relied**

15         **Upon The VE's Testimony To Find Plaintiff Capable Of Performing**

16         **Certain Jobs**

17

18        Plaintiff claims that the ALJ erred in finding her capable of

19   performing other work as a Cleaner, Small Parts Assembler and Counter

20   Clerk.  (Complaint Memo. at 3-6).  Specifically, Plaintiff claims that

21   the ALJ erred in relying on the testimony of the Vocational Expert

22   ("VE").  (<u>Id.</u> at 3).  Plaintiff argues that "[t]he jobs identified by

23   the VE are not consistent with the RFC assessment determined by the

24   ALJ."  (<u>Id.</u>).  These claims are without merit.

25

26        Social Security Ruling 96-8p defines a claimant's residual

27   functional capacity as "an assessment of an individual's ability to do

28   sustained work-related physical and mental activities in a work setting

                                    16

on a regular and continuing basis." The term "regular and continuing basis" is further defined as meaning "8 hours a day, for 5 days a week, or an equivalent work schedule." Id. "In determining residual functional capacity, the ALJ must consider subjective symptoms such as fatigue and pain." Smolen, 80 F.3d at 1291.

Here, the ALJ determined that Plaintiff retained the "residual functional capacity to perform a limited range of light work . . . Her mental impairment limits her to moderately complex tasks that are object oriented. She cannot be responsible for the safety of others when she is using marijuana." (AR 865). The ALJ based this determination on all symptoms and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence. (Id.). While Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms are not credible. (AR 866).

Plaintiff also claims that the ALJ erred in relying on the VE's testimony because it conflicted with the RFC assessment determined by the ALJ. (Plaintiff's Motion at 3). However, while Plaintiff argues that a deviation has occurred between Plaintiff's RFC of "a limited range of light work" (AR 865) and the jobs of cleaner, small parts assembly worker and counter clerk suggested by the VE, no such inconsistency actually exists. The ALJ had already determined Plaintiff was able to perform light and skilled work through the process of determining Plaintiff's RFC and therefore the VE's suggested jobs, taken from a representative sample of SVP: 2, light, unskilled work positions,

are fully supported.  (AR 865-69).  Plaintiff contends that the VE's suggested jobs do not match the job descriptions provided in the DOT, however, "[t]he DOT's occupational definitions are the result of comprehensive studies of how similar jobs are performed in different workplaces.  The term 'occupation,' as used in the DOT, refers to the collective description of these jobs.  Each occupation represents numerous jobs." Social Security Ruling 00-4P, 2000 WL 1898704.  The ALJ specifically asked the VE if the jobs he suggested were "a virtually complete list, or a representative sample of a larger universe of jobs," to which the VE responded the jobs were "a representative sample of quite a few jobs that would fall within that light work dynamic."  (AR 1166).

Furthermore, the ALJ fulfilled his affirmative duty to confirm that the jobs suggested by the VE were consistent with the DOT.  Social Security Ruling 00-4P ("When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT. In these situations, the adjudicator will: Ask the VE or VS if the evidence he or she has provided conflicts with information provided in the DOT").  The ALJ specifically asked the VE whether "these jobs that you're using [are] consistent with the DOT."  (AR 1166).  The VE responded that the suggested jobs were "strictly from the . . . DOT."  (Id.).  The ALJ had therefore completed his requirement to confirm the consistency of the jobs suggested by the VE with the DOT.

\\

\\

Even if a deviation from the DOT had occurred, the ALJ may rely on expert testimony that contradicts the DOT if the records contains persuasive evidence to support the deviation. See Johnson v. Shalala, 60 F.3d 1428, 1435-36 (9th Cir. 1995) (DOT classifications are rebuttable and are not sole source of admissible information concerning jobs) and Tommasetti v. Astrue, 533 F.3d 1035, 1042 (9th Cir. 2008)("an ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation") (internal quotation marks omitted). The VE testified that the jobs of cleaner housekeeper, small parts assembly worker and counter clerk were described by the DOT as unskilled, light work jobs. (AR 1165-66). While the VE did note that if Plaintiff "would be off task for two hours per day because of pain, mental symptoms, [and] side effects of medicines" none of the suggested jobs would be applicable, there is no evidence to support the limitations of this proposed hypothetical. (AR 1166). Dr. Sekhon repeatedly noted in Plaintiff's treatment notes that Plaintiff had retained the ability to "stay[] focused" provided she took her medication. (AR 1090, 1093, 1096, 1098). Plaintiff argues that she is incapable of performing the suggested jobs because they require "forceful, gripping, grasping, or twisting with the hands" which the ALJ's RFC of Plaintiff precludes. (Plaintiff's Motion at 5). However, the jobs suggested by the VE are part of the occupational category of "light, unskilled work," which is consistent with the ALJ's RFC assessment. (AR 865-69). The ALJ chose to rely on the expert testimony of Drs. Goldman, Landau and Malancharuvil, who all determined that Plaintiff's impairments do not justify greater restrictions in her RFC assessment. (AR 866-68)(citing AR 1046-53, 1135-39, 1140-43, 1145-48, 1162-64). Here, based on the record, there

19

1   was persuasive evidence to support any deviation from the DOT.   No

2   remand is required.

3

4   **B.   The ALJ Provided Specific And Legitimate Reasons To Reject The**

5       **Opinion Of Plaintiff's Treating Physician**

6

7       Plaintiff complains that the ALJ improperly rejected the opinion

8   of Plaintiff's treating psychologist, Dr. Gurmit Sekhon.   (Complaint

9   Memo. at 6-9).   Plaintiff further complains that the ALJ "failed to set

10  forth adequate reasons for giving insignificant weight to Dr. Sekhon's

11  opinion."   (Id. at 9).   This Court disagrees.

12

13      Although the treating physicians' opinion is entitled to great

14  deference, it is "not necessarily conclusive as to either the physical

15  condition or the ultimate issue of disability."   Morgan v. Comm'r of

16  Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999).   "When there is

17  conflicting medical evidence, the Secretary must determine credibility

18  and resolve the conflict."   Matney v. Sullivan, 981 F.2d 1016, 1019 (9th

19  Cir. 1992) (citing Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984)).

20  When a treating doctor's opinion is contradicted by another doctor, "the

21  Commissioner may not reject his opinion without providing 'specific and

22  legitimate reasons' supported by substantial evidence."   Lester v.

23  Chater, 81 F.3d 821, 830 (9th Cir. 1995).

24

25      "The opinion of a nonexamining medical advisor cannot by itself

26  constitute substantial evidence that justifies the rejection of the

27  opinion of an examining or treating physician."   Morgan, 169 F.3d at

28  602.   However, a court can reject such an opinion "based in part on the

20

testimony of a nontreating, nonexamining medical advisor." <u>Id.</u> (emphasis in original); <u>see also</u> <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751-755 (9th Cir. 1989) (affirming an ALJ's decision awarding less weight to a treating physician based on the testimony of a nonexamining physician that was consistent with evidence in the record).   In addition, the ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings.  <u>See</u> <u>Matney</u>, 981 F.2d at 1019; <u>Batson v. Comm'r of Soc. Sec.</u>, 359 F.3d 1190, 1195 (9th Cir. 2004).  Furthermore, an ALJ can reject a treating physician's assessment of limitations when the physician's clinical notes and other recorded observations regarding Plaintiff's capabilities contradict the assessment.  <u>Rollins v. Massanari</u>, 261 F.3d 853, 856 (9th Cir. 2005).

On January 8, 2010, Dr. Sekhon completed a medical opinion of Plaintiff, stating that Plaintiff was unable to meet competitive standards in completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  (AR 1031-32).  Dr. Sekhon also noted that Plaintiff had a limited but satisfactory ability to maintain regular attendance and be punctual within customary, usually strict tolerances, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes and maintain socially appropriate behavior. (<u>Id.</u>).  Plaintiff also was seriously limited but not precluded from interacting appropriately with the general public.  (AR 1032).

\\

\\

21

1    Dr. Sekhon's 2010 medical opinion displays an improvement in
2    Plaintiff's limitations from the medical opinion he completed on August
3    27, 2007. (AR 856-57). In 2007, Dr. Sekhon stated Plaintiff was unable
4    to meet competitive standards for maintaining regular attendance,
5    sustaining an ordinary routine, working in coordination with or
6    proximity to others and maintaining socially appropriate behavior.
7    (Id.). He also noted that Plaintiff had no useful ability to function
8    in performing at a consistent pace without an unreasonable number and
9    length of rest periods. (AR 856). The ALJ chose not to "give
10   significant weight to Dr. Sekhon's opinion as most of it is based on the
11   subjective complaints of the claimant and is not supported by objective
12   findings." (AR 869). Accordingly, the ALJ explained that he accorded
13   only "limited weight" to Dr. Sekhon's medical opinion where it differed
14   from Dr. Malancharuvil and Dr. Goldman's opinions regarding Plaintiff's
15   mental functional capacities. (AR 866-69).

16

17   As noted above, the ALJ found that the medical statement findings
18   were not consistent with the treatment notes and Plaintiff's testimony
19   and activities. (AR 869). Specifically, the ALJ explained that "Dr.
20   Sekhon indicated that the claimant could not maintain attention for two
21   hour segments, but his type written notes reflect that during office
22   visits, the claimant has been alert and stays focused." (Id.). While
23   Plaintiff claims that "Dr. Sekhon's opinion has remained consistently
24   the same and unchanged since the *Work Capacity Evaluation (Mental)*
25   evaluation form he completed on December 26, 2003" (Complaint Memo. at
26   7), Dr. Sekhon's 2007 and 2010 evaluations indicate an improvement in
27   Plaintiff's abilities in work situations. (AR 856-57, 1031-32).
28   Furthermore, after January 4, 2010, "the remainder of [Dr. Sekhon's]

22

treatment notes continue in the same vein, with [Plaintiff's] condition overall stable with medication." (AR 867).   The contradictions in Dr. Sekhon's own statements are a legitimate reason to give less weight to his opinions.

When Dr. Sekhon claimed that Plaintiff could not meet competitive standards, his explanations were that Plaintiff "does not always react well to others when she is under stress; she does not do well performing routine tasks; she does not complete simple tasks such as cooking; she has racing thoughts and is easily distracted; she will 'blow' if someone irritates her; and she forgets items, such as when cooking, she will place a skillet in the refrigerator."  (AR 869)(citing AR 1032). However, his treatment notes indicated that when treated with medication, Plaintiff is "alert, cooperative, directable, less anxious, and less distanced."  (AR 1087).

The record further supports the ALJ's finding that Dr. Sekhon's medical statement is inconsistent with the medical evidence.   The statement is also contradicted by both Dr. Malancharuvil and Dr. Goldman's opinions.  (AR 866-67).   For example, Dr. Malancharuvil examined Plaintiff and testified that she had "a personality disorder with anti-social features, a mood disorder, and continuing marijuana use, which do not meet or equal Parts B or C of Listings 12.04, 12.08, or 12.09."  (AR 866)(citing AR 1161-2).   Dr. Malancharuvil also confirmed that Dr. Goldman's "only diagnosis [of Plaintiff] was malingering."  (Id.)(citing AR 1161, 1050).   Dr. Goldman initially diagnosed Plaintiff with "malingering, amphetamine dependence in full remission, and an underlying personality disorder with antisocial and

23

histrionic features." (AR 868)(citing AR 1049-1050). However, Dr. Goldman concluded the diagnosis by noting "that [Plaintiff's] limitations could not be accurately assessed due to her malingering." (Id.)(citing AR 1050, 1053). In addition, Dr. Goldman noted that Plaintiff said during the exam that "she showers, bathes, dresses, and grooms herself," "takes care of her personal finances without assistance," and "prays, cleans house, and visits her best friend" indicating a lack of significant disability. (Id.)(citing 1047). Thus, it was legitimate for the ALJ to give less weight to Dr. Sekhon's opinions to the extent his opinions were inconsistent with substantial evidence in the record.[3]

While the ALJ did not go through each of the progress notes and explain how the notes contradicted the doctor's form evaluation, the ALJ specifically mentioned the progress notes and considered Plaintiff's history of treatment with Dr. Sekhon, noting the content in the progress

_____

[3] Plaintiff also offered inconsistent statements concerning her history with drugs and alcohol, which renders her self-reporting of symptoms to Dr. Sekhon unreliable. During the January 2010 hearing, Plaintiff stated that in 2006, she had been using "marijuana, weed, for [her] depression." (AR 1143-44). In response, Dr. Malancharuvil recommended that Plaintiff proffer "actual objective data saying, okay, here is the date [and] I've been sober since whenever," as Plaintiff's credibility would benefit from evidence of sobriety. (AR 1145). During the June 2010 hearing, Plaintiff claimed "I never was [sic] on speed in my whole life," to which the ALJ responded, "I'm glad to hear that except that you have . . . you told the doctor you were using it at one time, and you have quit." (AR 1155). Plaintiff then said, "I've been clean for 14 years on cocaine. That was the drug substance at the time," and affirmed "never in [her] whole life" has she used speed. (Id.). However, Plaintiff did comment that she does "smoke [marijuana] as far as my depression from time to time" and she smokes "twice a week." (Id.). She then responded to the ALJ's question of "[h]ow much are you smoking?" with "[o]ne joint a day." (Id.).

24

notes does not support the several severe mental limitations that Dr. Sekhon found in the medical statement. (AR 203-220, 984-1021, 1087-1101). While Plaintiff argues that the progress notes reflect Dr. Sekhon's assessment due to his "his longstanding treating relationship [with Plaintiff] and clinical observations [of Plaintiff] overtime [sic]" (Complaint Memo. at 8), Dr. Sekhon's January through May 2010 notes indicate a consistent trend of improvement of Plaintiff's symptoms, provided she takes the appropriate medications. (AR 1087-98).

Accordingly, the Court concludes that the ALJ provided ample specific and legitimate reasons for rejecting the treating doctor's opinion. Accordingly, remand is not required.

## VIII.

### CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 24, 2011.

_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

**THIS MEMORANDUM IS NOT INTENDED FOR PUBLICATION NOR IS INTENDED TO BE INCLUDED IN OR SUBMITTED TO ANY ONLINE SERVICE SUCH AS WESTLAW OR LEXIS.**